**In re SMITH.**

No. 2560.

District Court, S. D. West Virginia.

May 6, 1938.

S. S. McNeer, of Huntington, W. Va. (Rolla D. Campbell, of Huntington, W. Va., on the brief), for trustee.

Walter H. Buck, of Baltimore, Md., and Frank Lively, of Charleston, W. Va. (Daniel Dawson, and Anderson D. Meadows, both of Huntington, W. Va., on the brief), for Union Trust Co. of Maryland.

HARRY E. WATKINS, District Judge.

R. R. Smith was adjudged bankrupt on December 23, 1931, in an involuntary proceeding commenced November 30, 1931. Certain bonds of the Columbia Gas & Electric Company of the par value of $72,000 came into the custody of the trustee. The Union Trust Company of Maryland, hereinafter called the trust company, filed its petition asking that these bonds be turned over to it to be sold, or, in the alternative, that they be sold by the trustee, and, in either event, that the proceeds of sale be applied to a note of $72,000 held by the trust company against Smith. The trust company also filed a secured claim upon this note, claiming the bonds had been assigned to it by the bankrupt as security for the payment of the note on February 4, 1931, more than 4 months before the involuntary petition in bankruptcy was filed. The answer of the trustee to the trust company's petition, and the trustee's objections to its proof of secured claim, denies its right to either the possession of, or a lien upon, these bonds, or the proceeds thereof, prays that the petition be dismissed, and the claim disallowed as a lien, or secured claim upon the bonds, or their proceeds. The referee took testimony, heard argument, decided in favor of the trustee, denied the prayer of the trust company's petition, and sustained the objections of the trustee to the secured claim, in so far as it asserted a lien on the bonds, or the money realized from their sale. From the referee's order entered August 24, 1934, this review is taken.

The important question in this case concerns the validity of an alleged equitable assignment of the bonds by Smith, dated February 4, 1931. The trustee says: (1)

Such alleged assignment is not valid, either in law or equity, because the bonds were not in actual or potential existence on February 4, 1931; and (2) if otherwise valid as an equitable assignment, the transfer of the bonds, or their proceeds, to the trust company pursuant thereto, created a voidable preference under section 60 of the Bankruptcy Act, 11 U.S.C.A. § 96.

In January, 1931, the trust company was pressing Smith to pay his note of $72,000, then due and secured by 1,600 shares of the First Huntington National Bank. The trust company acquired this note as the successor of the Farmers & Merchants National Bank of Baltimore. There is a conflict in the evidence as to whether the stock would have then brought sufficient to have paid the debt. Smith owned a one-third undivided interest in certain oil and gas properties in Kentucky and West Virginia, one T. E. Houston owning the other two-thirds. In 1929 the Columbia Gas & Electric Company offered Smith and Houston $2,000,000 for this property, but the offer was refused, Smith hoping to get a higher price. Being unable to get a higher price, Smith later opened up negotiations with the Columbia and others, being pressed to do this by the First Huntington National Bank, and Union Bank & Trust Company of Huntington, W. Va., which held a first and second mortgage, respectively, on such property. These banks were wanting their debts paid. Smith wanted to sell his interest, and for this purpose executed a power of attorney, dated November 18, 1930, to C. M. Gohen, president of the First Huntington National Bank, and to Julius Frieburg, a Cincinnati attorney. Smith did not want his bank stock sold, but desired that the trust company should carry the loan until he was able to make a sale of his interests in the gas properties. Unable to sell his property at the renewal date of the note in March, 1931, and desiring an additional extension, Smith, a resident of Huntington, wrote to Gohen at Huntington, as follows:

"February 4th, 1931.
"Mr. C. M. Gohen,
"Huntington, W. Va.
"Dear Sir:
"You have a power of attorney to represent me in the sale of the Houston-Smith gas properties in Kentucky and West Virginia and your bank, the First Huntington National, and the Union Bank & Trust Company, hold mortgages against my un-

divided one-third interest in this property for approximately $300,000 as evidenced by my note as maker, and endorser on other notes in the two banks. I am due the Farmers & Merchants National Bank of Baltimore, Md., $72,000, evidenced by my note with collateral attached of –1,600 shares of First Huntington National Bank stock.

"I want to pay this note out of the sale of the gas property, rather than to be forced at this time to have a sale made of this bank stock. I am hereby authorizing you to pay this note, if acceptable to the Farmers and Merchants National Bank, from the monies received from the sale of this gas property, and authorize you to provide in the sale of the property that the total amount of $372,000.00 which covers the amount due your bank, the Union, and this $72,000 note, be paid direct to the First Huntington National Bank for the purpose of discharging the indebtedness above set out.

"Yours truly,
"[Signed] R. R. Smith"

On March 4, 1931, Gohen wrote to William H. Gideon, vice chairman of the board of directors of the trust company, inclosing the Gohen letter, supposed to have been dated March 4th, but actually dated February 4th. He advised that the prospect of selling the property seemed more hopeful than it had been for some time; that the property had been appraised about a year before for about $2,000,000, but that Smith and Houston had refused an offer of that amount therefor, and that subsequently the property was offered in all the markets of the country and became somewhat discredited as a result; that he had purposely withdrawn the property from the market; and that he had a power of attorney to represent Smith in any sale. He stated that Smith wanted to renew the note for 30 days and that, if a sale of the gas property was effected within that time, he believed the trust company would be paid. He also stated that, "times are certainly not propitious for the block of bank stock which you hold to be placed upon the market. It can of course be sold at a price, but I believe it would be more to your interest, as well as to that of Captain Smith, to renew the paper for thirty days and see how matters work along on the sale of the gas property." He further stated, "You may also return to me the inclosed letter and I will accept the

same and agree to pay to you the money, if and when it comes into my hands."

On March 10 Gideon wrote Gohen, returning the Smith letter of February 4th and stating that he was accepting Smith's 30-day renewal note. On April 16th Smith revoked the power of attorney, but efforts to sell the gas property were continued by Gohen, whose bank was interested in a sale in order to collect a $200,000 mortgage it held against the Smith property. On May 21 Gohen wrote Gideon that he intended to go to Chicago to negotiate with some people from Chicago and advising that other parties to whom an option had been given 30 days ago had failed to raise the money and the deal was off. Smith defaulted in interest due the trust company in June, 1931, and his note was then placed on a demand basis. A sale of his interest in the gas property was the only possible way for him to pay up.

Negotiations were then resumed to obtain a proposition from Columbia interests, but no headway was made until August 1, 1931, when United Fuel Gas Company, a Columbia subsidiary, through H. A. Wallace, tentatively agreed by an exchange of letters to buy, and the owners tentatively agreed to sell, the property for bonds of Columbia of the par value of $1,500,000, subject to certain adjustments and title differences. On August 4, Smith wrote to the trust company, stating that he had not remitted the interest due on his note "for the reason that I have been so hard up I could hardly get my breath." He further stated that the sale of the gas property had been agreed upon and that there was only a matter of working out details which he thought would be completed in the next few days, "at which time, I will have you send my note with the collateral and the order I gave you to Mr. Gohen on the funds to be derived from the sale of the gas property in payment of this note."

The purchaser raised many objections to title, acreage, and to term of leases and made up a schedule of deductions on account of such matters, to which Smith objected, and for a while it looked like the sale would not go through. On November 19, 1931, United Fuel Gas Company submitted an agreement in writing, whereby it agreed to accept deeds for certain acreage and deliver in payment therefor $1,175,000 par value of Columbia bonds, and further agreed to purchase within a period of 6 months other properties to which the sellers

should secure marketable title at prices set forth on an attached schedule, which schedule showed deductions of $325,079.80. This was the first definite agreement as to the exact price to be paid. Smith refused to sign this agreement, unless the Houston interests would accept his one-third interest in the timber on such properties and certain stock, in settlement of an indebtedness of $200,000 owing to them by Smith and also pay his wife $20,000 for her dower interest in such properties. The Houston interests agreed to do this, after Gohen, for the two Huntington banks, agreed to contribute to the Houston interests $5,000 par value of Columbia bonds it was to receive from the sale to help pay the dower. The sale was completed on November 25, 1931, in New York City, when Gohen delivered a deed for the properties and received therefor $387,000 par value of Columbia bonds. Of these bonds, $200,000 par value was for the account of First Huntington National Bank, $115,000 par value for Union Bank & Trust Company, of Huntington, to pay their respective mortgages, leaving $72,000 par value of bonds, which were attached in Gohen's hands in New York City upon delivery, by a Smith creditor. On November 30 an involuntary petition in bankruptcy was filed against Smith at Huntington, W. Va. After Smith's adjudication and the election of a trustee, the attachment suit was dismissed without prejudice, the bonds turned over to the trustee in bankruptcy, and subsequently sold.

The tentative agreement to sell the property seems to have occurred just within 4 months of the filing of the petition in bankruptcy. The final agreement was signed and the sale completed within a few days prior to the filing of the petition. The question therefore arises as to the validity and effect of the letter or "order" of February 4, 1931, as a present assignment of the bonds.

The trustee claims that Smith's "order" of February 4, 1931, was void and of no effect in law or equity, because there was nothing to assign, and no funds in actual or potential existence on which an assignment could then operate, and that the $72,000 in bonds remain the property of Smith and are distributable to his general creditors. To sustain this proposition, the trustee says that this court must follow the decisions of the Supreme Court of West Virginia in determining whether or not

such "order" amounted to a present assignment. The trust company says, first, that this is a question of general law; that the West Virginia decisions are not controlling, and cites the leading case of Swift v. Tyson, 16 Pet. 1, 10 L.Ed. 865, as authority. Since this authority was cited, the Supreme Court of the United States has settled this question. In Erie Ry. Co. v. Tompkins, 303 U.S. ——, 58 S.Ct. 817, 82 L.Ed. ——, decided April 25, 1938, the Supreme Court overruled the doctrine laid down in Swift v. Tyson, supra, in the following language (page 822): "Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. And whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern. There is no federal general common law. Congress has no power to declare substantive rules of common law applicable in a state whether they be local in their nature or 'general,' be they commercial law or a part of the law of torts."

Secondly, the trust company asserts that the order amounted to a present valid assignment even under West Virginia decisions. I am unable to agree with the trust company in either contention. The West Virginia decisions are controlling on the validity of this alleged assignment, and in West Virginia neither choses in action or property can be validly assigned, at law or in equity, unless they have actual or potential existence at the time of the assignment. A mere possibility, or expectancy, of acquiring property or funds, does not constitute a potential interest in the thing assigned within the meaning of this rule.

The West Virginia cases bearing on this question are few and they will be stated in chronological order as follows: Huling, et al. v. Cabell, 9 W.Va. 522, 27 Am.Rep. 562; First National Bank of Wellsburg v. Kimberlands, 16 W.Va. 555; Stevenson v. Kyle, 42 W.Va. 229, 24 S.E. 886, 57 Am. St.Rep. 854; Wilt v. Huffman, 46 W.Va. 473, 33 S.E. 279, and Hines, Adm'r., v. Fulton, 92 W.Va. 204, 114 S.E. 684.

The last three cases are not of much help for the following reasons: In Stevenson v. Kyle, supra, the case was decided primarily upon the principle that it was against public policy to permit public officers to assign future salary to be earned by them as public officers. In Wilt v.

Huffman, supra, there was an existing contract at the time of assignment of money to be earned thereunder. In Hines, Adm'r., v. Fulton, supra, the claims existed in fact at time the assignment was made and the only difficulty was that the amount had not been agreed upon. The first two cases above cited are more nearly in point.

In Huling v. Cabell, supra, the proceeds of an agricultural fair, which had already been advertised, and which was to commence 3 days afterwards, were assigned to the president of a bank for payment of expenses of the fair and other debts. The court held that the assignment was not effective to pass title to the fund on the ground that the proceeds of the fair, to be held upon its own land, had no real or potential existence 3 days before the fair was to begin, and so were not assignable. In arriving at this conclusion, Judge Green, one of the most eminent of West Virginia jurists, stated: "Applying these principles to the present case, was there any potential interest, owned by the West Virginia Agricultural Society, when they made the assignment, in the proceeds which they expected to arise from the Agricultural Fair, to be held in a few days thereafter? It seems to me clearly not. It is true they owned the grounds, upon which they expected to hold the fair, out of which they expected these proceeds to arise, and had advertised the holding of the fair in a few days, but in the case just cited, the assignor owned a schooner, which, when the assignment was made, was just about to start on a fishing voyage, in which he expected to catch halibut. The expected proceeds of this Agricultural Fair were no more assignable than were the expected proceeds of the laborer, who, when the assignment was made, anticipated that he would be employed to work on the Boston sewers, as he had been before. His expectation was probably as well founded as that of the West Virginia State Agricultural Society. But he had, when he made this assignment, no existing contract with anyone out of which these expected wages might arise, and so here the West Virginia State Agricultural Society had no agreement with anyone out of which the proceeds they undertook to assign, might arise. It was a mere expectancy, based on no existing contract, and was, therefore, not assignable."

In First Nat. Bank v. Kimberlands, supra, an order was given on a fund which might arise from the sale of a foundry, including personal and real property. Some 4 days before the order was given it had been agreed, by the Wellsburg Manufacturing Company and the owner of this foundry property, that they would purchase the same, and that the purchaser would pay $5,100 for the personal property, but the price of the real estate was not agreed upon until 2 or 3 hours after the order was given. On these facts, the court held that the fund had, when the order was drawn, a potential existence, and the order operated as an equitable assignment of the fund pro tanto. In its opinion the court said, "the fund on which the order is drawn, must have either an actual or potential existence; for if it has not, it cannot be assigned in any manner. It is however, in order that it may be equitably assigned, only necessary that a chose in action should have a potential existence. It is not necessary that it should be either certain in amount or be incapable of being defeated and avoided by a third party."

Syllabus 14 of the opinion of the Supreme Court of West Virginia in the Kimberlands Case is as follows: "A mere possibility or expectancy can not be assigned either at law or in equity, and therefore, if, when such an order is given, there be neither an actual debt nor any contract, engagement or arrangement between the drawer and the drawee out of which a debt could arise, such a draft could not operate as an equitable transfer of any subsequent debt."

The difficulty in here seeking to apply the Kimberlands Case to the advantage of the trust company is that, when the order of February 4th was given, there was no existing agreement with anyone for sale of the gas property. Columbia's offer had been refused, and sale to those interests was not only remote, but improbable. Options were given to other parties, and for a while the properties were completely withdrawn from the market. Smith's interest in the gas properties was encumbered with two large mortgages in favor of the two Huntington banks, and, until a contract of sale was in existence for a sum in excess of these debts, it could not even be said that there would be any residue of funds to assign. The order of February 4th, under these circumstances, clearly did not operate as an assignment, either at law or in equity. The object of assignment was not then in actual or potential existence.

In my opinion, there was no binding contract of sale for Smith's properties until November 25, 1931. The trust company does not contend that there was a binding contract of sale before the exchange of letters on July 30 and August 1, which would be just within the 4-month period prior to filing of the petition in bankruptcy. Under these circumstances the bankruptcy intervened before the trust company obtained any prior rights. Dealers' Finance Co. v. Coulter, D.C., 3 F.Supp. 114.

Bankruptcy proceedings are proceedings in equity and rules of equity control. However, it is only when the rights of third parties will not be prejudiced that equity, treating as done that which was agreed to be done, will turn a contract to give an assignment on property to be acquired into an equitable assignment on such property, as fast as acquired, and enforce the same, accordingly, against the assignor. The agreement and intention of the parties to an assignment not yet in existence will be given effect by a court of equity so far as practicable, provided no interest is affected except that of the assignor and assignee who entered into the agreement; but equity closes its doors and refuses relief if the interests of creditors are involved. Zartman v. First National Bank of Waterloo, 189 N.Y. 267, 82 N.E. 127, 12 L.R.A.,N.S., 1083.

By the great weight of authority, a conveyance or transfer by an insolvent debtor within 4 months of the filing of the petition in bankruptcy against him, which otherwise constitutes a voidable preference, does not lose that character or become valid by reason of the fact that it was made pursuant to an express agreement to do so, entered into prior to the 4-months period. Any other holding would frustrate and destroy the purpose and policy of the Bankruptcy Act. See Judge Waddil's opinion in Re Dismal Swamp Contracting Co., D.C., 135 F. 415. An assignment of a right expected to arise under an agreement not yet in existence, even in equity, in the nature of things, cannot operate as a present assignment. Equity treats such an assignment as a contract to assign until the right comes into existence. Seaboard Small Loan Corporation v. Ottinger, 4 Cir., 50 F.2d 856, 77 A.L.R. 956. This case is distinguished from Sexton v. Kessler & Co., 225 U.S. 90, 32 S.Ct. 657, 56 L.Ed. 995, cited by the trust company, because in the latter case, the subject of assignment, or lien, was in existence. Under such circumstances, a present right in such subject matter could in equity immediately pass to and vest in the assignee. That is obviously impossible, even in equity, where, as here, the subject matter of an assignment is not then in existence.

It follows that, assuming the order of February 4, 1931, to be valid, if, when the contract to sell to the United Fuel Gas Company was entered into, the circumstances were such that an assignment at that time of Smith's right thereunder would have been void under section 60 of the Bankruptcy Act, 11 U.S.C.A. § 96, the order of February 4th would not prevent that result.

The elements of a preference under section 60, 11 U.S.C.A. § 96, are, (1), transfer from insolvent to a creditor; (2), its effect to enable such creditor to obtain a greater percentage of his debt than others in the same class; (3), reasonable cause for him to believe that would be its effect; and, (4), transfer within 4 months of bankruptcy. If such assignment had been otherwise valid, I still believe all of these elements were present and that the alleged transfer to the trust company amounted to a voidable preference under section 60 of the Bankruptcy Act, 11 U.S.C.A. § 96.

For the reasons assigned, the order of the referee dated August 24, 1934, is hereby affirmed.